IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **Criminal No.  RDB-14-0389** |
| **ANTOINE DEMARR WASHINGTON,** *et al*. | : | |
| | : | |
| **Defendants** | : | |
| | : | |

...o0o...

## GOVERNMENT'S CONSOLIDATED RESPONSE
## TO DEFENDANTS' PRE-TRIAL MOTIONS

Now comes the United States of America by its attorneys, Rod J. Rosenstein, United States Attorney for the District of Maryland, and Seema Mittal and Christopher J. Romano, Assistant United States Attorneys, and responds in opposition to the Defendants' Pre-Trial Motions.

## I.    FACTUAL AND PROCEDURAL SUMMARY OF THE CASE

On August 22, 2014, a federal grand jury returned a ten count indictment in the above-captioned matter.  Count One charged that from in or about November 2013, and continuing through August 2014, in the District of Maryland and elsewhere, a total of nine defendants, including Antoine DeMarr Washington (Washington), Jermaine Cannady (Cannady), Guy Bordes Agnant (Agnant), Cornell Dion Brown, Jr. (Brown), Dominic William Parker (Parker), Vincent Cooper (Cooper), Ronald Timothy Sampson (Sampson), Donte Eugene (Taylor), and Tavon Alexander Louis Hopkins (Hopkins), did knowingly, willfully, and unlawfully combine, conspire, confederate, and agree with each other, and with Michael Barrett and others known and unknown to the Grand Jury to knowingly and intentionally distribute and

possess with intent to distribute cocaine, a Schedule II controlled substance and heroin, a Schedule I controlled substance, in violation of 21 U.S.C. § § 846, 841(a)(1).

Count Two charged that on or about August 11, 2014, in the District of Maryland, Washington did knowingly and intentionally attempt to possess with the intent to distribute 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, and 1 kilogram or more of a mixture and substance containing a detectable amount of heroin, all in violation of 21 U.S.C. §§ 841(b)(1)(A), 846.

Count Three charged that on or about August 11, 2014, in the District of Maryland, Cannady did knowingly and intentionally attempt to possess with the intent to distribute 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, and 1 kilogram or more of a mixture and substance containing a detectable amount of heroin, all in violation of 21 U.S.C. §§ 841(b)(1)(A), 846.

Count Four charged that on or about August 11, 2014, in the District of Maryland, Agnant did knowingly and intentionally attempt to possess with the intent to distribute 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(A), 846.

Count Five charged that on or about August 11, 2014, in the District of Maryland, Brown did knowingly and intentionally attempt to possess with the intent to distribute 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(A), 846.

Count Six charged that on or about August 11, 2014, in the District of Maryland, Parker did knowingly and intentionally attempt to possess with the intent to distribute 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, and 1 kilogram or

more of a mixture and substance containing a detectable amount of heroin, all in violation of 21 U.S.C. §§ 841(b)(1)(A), 846.

Count Seven charged that on or about August 11, 2014, in the District of Maryland, Cooper did knowingly and intentionally attempt to possess with the intent to distribute 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, and 1 kilogram or more of a mixture and substance containing a detectable amount of heroin, all in violation of 21 U.S.C. §§ 841(b)(1)(A), 846.

Count Eight charged that on or about August 11, 2014, in the District of Maryland, Sampson did knowingly and intentionally attempt to possess with the intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, and 1 kilogram or more of a mixture and substance containing a detectable amount of heroin, all in violation of 21 U.S.C. §§ 841(b)(1)(A), 846.

Count Nine charged that on or about August 11, 2014, in the District of Maryland, Taylor did knowingly and intentionally attempt to possess with the intent to distribute 500grams or more of a mixture and substance containing a detectable amount of cocaine, and 1 kilogram or more of a mixture and substance containing a detectable amount of heroin, all in violation of 21 U.S.C. §§ 841(b)(1)(A), 846.

Count Ten charged that on or about August 11, 2014, in the District of Maryland, Hopkins did knowingly and intentionally attempt to possess with the intent to distribute 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(A), 846.

Several of the Defendants[1] have filed pre-trial motions, seeking, *inter alia*, suppression of statements and tangible evidence; suppression of pre-trial and in-court identification; dismissal of the indictment; severance; a bill of particulars; discovery, *viz.* co-defendants' statements, and disclosure of informants(s); as well as a motion to exclude evidence not disclosed pursuant to terms of the discovery agreement; Rule 12; 404(b) and 609; and inquiry into law enforcement officers' backgrounds.  In addition, many of the defendants have also filed motions to adopt their co-defendant's motions, or to file additional motions.

This case arose out of an arrest of an individual by the name of Michael Barrett (Barrett). Barrett was arrested by the FBI Safe Street Task Force on August 6, 2014, as he attempted to take delivery of approximately 25 kilograms of cocaine and 6 kilograms of heroin.  Barrett, immediately after his arrest on August 6, 2014, expressed a willingness to cooperate and on August 11, 2014, made consensually recorded phone calls to the defendants, which resulted in all of the defendants, individually and collectively, agreeing to meet Barrett to acquire cocaine, heroin, or both.  After all of the defendants drove to the agreed upon meet locations to meet with Barrett to acquire the narcotics, they were arrested.  Several of the defendants had on their persons, or in their possession, significant amounts of U.S. currency.

The Government anticipates its evidence will show that Barrett has known each of the defendants prior to August 2014.  Indeed, information provided by Barrett revealed that he had an ongoing relationship with the defendants, dating back to November 2013, wherein he had supplied each of the defendants with significant kilogram quantities of cocaine, heroin, or both, for re-sale, which Barrett had obtained from a source of supply in California.

---

[1] Defendants Cooper and Hopkins have pled guilty and are awaiting sentencing.  Defendant Taylor has advised, he too, will be entering a plea of guilty.

## II.   <u>ARGUMENT</u>

### (A)      **None Of The Defendants Are Entitled To Severance.**

Defendants Washington, Cannady, Sampson, Agnant and Parker have filed a motion for severance.  (Docket #s 108, 112, 123, 128, 130).  To the extent other defendants have filed boiler plate motions to adopt the motions filed by the co-defendants, arguably they also seek a severance.

Defendants who are indicted together should be tried together.  *United States v. Hall*, 93 F.3d 126, 131 (4th Cir. 1996).  Indeed, unless a "miscarriage of justice" will result, there is a presumption that co-defendants should and will be tried together.  *Richardson v. Marsh,* 481 U.S. 200, 206-11 (1987); *United States v. Samuels*, 970 F.2d 1312, 1314 (4th Cir. 1992).  This is particularly true for defendants who participate in the same conspiracy.  *United States v. Akinkoye*, 185 F.3d 192, 197 (4th Cir. 1999); *United States v. Tipton*, 90 F.3d 861, 883 (4th Cir. 1996); *United States v. Ford*, 88 F.3d 1350, 1361 (4th Cir. 1996); *United States v. Reavis*, 48 F.3d 763 (4th Cir. 1995); *United States v. Roberts*, 881 F.2d 95, 102 (1989).  Count One of the indictment charges that from November 2013, and continuing through August 2014, the defendants conspired with each other and with Michael Barrett and others known and unknown to the Grand Jury to distribute and possess with the intent to distribute cocaine and heroin.

The Government has broad discretion in initiating and structuring a prosecution, including the joinder of counts and defendants that qualify under Fed. R. Crim. P. 8.  *United States v. Smith*, 44 F.3d 1259, 1266 (4th Cir. 1995).

Fed. R. Crim. P. 8 (b) provides that:

> Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.  Such defendants may be charged in one or more

counts together or separately and all defendants need not be charged in each count.

In the case at bar, each of the defendants are properly joined with their co-defendants, as the Government's proof will establish that they all participated in a drug conspiracy with Barrett and others.  Not only did all the defendants agree to meet with, and attempt to purchase heroin and or cocaine, but defendants Hopkins and Brown were arrested when they arrived together to meet with Barrett.  Parker and Cannady were arrested when they too arrived together at the agreed upon meet location in order to meet with Barrett.  Cooper and Washington were both arrested after agreeing to meet with Barrett, but drove separately to a meet location, which was an apartment building where Cooper worked part-time and had access to vacant apartments.  Taylor, Agnant and Sampson all agreed to meet Barrett, but arrived separately at meet locations.  In a consensually recorded call between Barrett and Sampson, Sampson at the time said he had "Bro" with him and Barrett asked Samson if "Bro" was the one he f***ed with or no and Sampson replied "yeah."  In a later call, Sampson said he had put the word out that he had some cash for Barrett.   In a consensually recorded call between Barrett and Brown, Barrett asked Brown if he felt like coming with "Maine" (Cannady) and later on in the call, Barrett discussed with Brown dealing with not only Brown, but with "Nick" (Parker) "Maine" (Cannady) and "Tay" (Hopkins).  In a call 2 minutes later, between Barrett and Cannady, Cannady asked Barrett if he should bring "Nick" (Parker) and "Nellie" (Brown) "up the way."   Also during the call between Barrett and Brown, Barrett made a reference to having to see "Guy" (Agnant).

In *Zafiro v. United States*, 506 U.S. 534 (1993), the Supreme Court stated:

> There is a preference in the federal system for joint trials of defendants who were indicted together.  Joint trials "play a vital role in the criminal justice system."  They promote efficiency and "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts."  For these reasons, we repeatedly have approved of joint trials. (Citations omitted).

*Id* at 537.

To the extent that the defendants attempt to argue that the jury would be confused by possible irreconcilable and conflicting defenses, Fed. R. Crim. P. 14 provides in part that: "If it appears that a defendant or the government is prejudiced by joinder of offenses or of defendants...the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever relief justice requires."  In order to prevail on a severance motion pursuant to Rule 14, each of the defendants bears the burden of demonstrating that a joint trial "would be so unfairly prejudicial that a miscarriage of justice would result."  *United States v. Williams*, 10 F.3d 1070, 1080 (4th Cir. 1993).  While the defendants may attempt to allege prejudice, the burden is squarely on them to establish that actual prejudice would result from a joint trial.  *Reavis*, 48 F.3d at 767; *United States v. Brooks*, 957 F.2d 1138, 1145 (4th Cir. 1992).  None of the defendants have met their burden.

Even if any of the defendants were to demonstrate any actual prejudice, as opposed to their speculative allegations of prejudice, the mere showing of prejudice is not enough to require severance.  *United States v. Lane*, 474 U.S. 438, 449 (1986).  Rather, tailoring of relief, if any, for any potential prejudice resulting from a joint trial is left to the sound discretion of the district court.  *Zafiro*, *supra* at 538-540.  As the Fourth Circuit stated in *United States v. Jamar*, 561 F.2d 1103 (4th Cir. 1977):

> In ruling on a motion for severance, the trial court is vested with discretion; it must carefully weigh the possible prejudice to the accused against the often equally compelling interests of the judicial process, which include the avoidance of needlessly duplicative trials involving substantially similar proof.

*Id* at 1106.

The trial court has a wide range of discretion in matters of severance. *United States v. Acker*, 52 F.3d 509, 514 (4th Cir. 1995). A limiting instruction and the jury's ability to compartmentalize the evidence as to each defendant act to cure any risk of prejudice. *United States v. Hayden*, 85 F.3d 153, 160 (4th Cir. 1996); *Zafiro*, 506 U.S. at 539. Accordingly, the motions for severance should be denied.

### (B)     Defendant Sampson Is Not Entitled To A Bill Of Particulars.

Defendant Sampson has filed a motion for a bill of particulars. (Docket # 119). To the extent that other defendants have filed boilerplate motions to adopt the motions filed by the co-defendants, arguably they also seek a bill of particulars. It is well-settled law that defendants are not entitled to a bill of particulars as a matter of right. *Wong Tai v. United States*, 273 U.S. 77, 82 (1927). "A bill of particulars is a defendant's means of obtaining specific information about charges brought in a vague or broadly-worded indictment." *United States v. Dunnigan*, 944 F.2d 178, 181 (4th Cir. 1991), citing *United States v. Debrow*, 346 U.S. 374, 378 (1953), *rev'd on other grounds*, 507 U.S. 87 (1993).

As a general matter, an indictment is sufficient if it alleges the essential elements of the crime with which a defendant is charged in a manner that permits the defendant to prepare a defense and plead double jeopardy in any future prosecution for the same offense. *United States v. Hooker*, 841 F.2d 1225, 1227 (4th Cir. 1988); *American Waste Fibers Co.*, 809 F.2d 1044, 1046 (4th Cir. 1987). As long as the indictment fulfills these purposes, a bill of particulars is unnecessary and its denial does not constitute an abuse of discretion. *United States v. Butler*, 885 F.2d 195, 199 (4th Cir. 1989); *United States v. Jackson*, 757 F.2d 1486, 1491 (4th Cir.1985).

If an indictment is deficient, the "purpose of a bill of particulars is to enable the defendant to obtain sufficient information on the nature of the charges against him so that he may prepare for trial, minimize the danger of surprise at trial, and enable him to plead his acquittal or

conviction in bar of another prosecution for the same offense." *United States v. Schembari*, 484 F.2d 931, 934-35 (4th Cir. 1973). *Accord*, *United States v. Dulin*, 410 F.2d 363, 364 (4th Cir. 1969). But if, as here, the indictment fully complies with the requirements of the Fifth and Sixth Amendments and Fed. R. Crim. P. 7(c), "[a] bill of particulars is not to be used to provide detailed disclosure of the government's evidence in advance of trial." *United States v. Automated Med. Lab., Inc.*, 770 F.2d 399, 405 (4th Cir. 1985); *United States v. Fletcher*, 74 F.3d 49, 53 (4th Cir.1996). As another circuit has stated:

> A bill of particulars, unlike discovery, is not intended to provide the defendant with the fruits of the government investigation . . . . Rather, it is intended to give the defendant only that minimum of information necessary to permit the defendant to conduct his <u>own</u> investigation.

*United States v. Smith*, 776 F.2d 1104, 1111 (3d Cir. 1985) (citations omitted; emphasis in original); *United States v. Burgin*, 621 F.2d 1352, 1359 (5th Cir. 1980) (a bill of particulars "is not designed to compel the government to detailed exposition of its evidence or to explain the legal theories upon which it intends to rely at trial"); *Hemphill v. United States*, 392 F.2d 45, 49 (8th Cir. 1968) ("[a]cquisition of evidentiary detail is not the function of the bill of particulars"); *United States v. Fischbach and Moore, Inc.*, 576 F. Supp. 1384, 1389 (W.D. Pa. 1983) ("[i]t is well established that a bill of particulars is not to be used by the defendant as a discovery tool, . . . by which defendants obtain disclosure of every detail of the theory and preparation of the government's case . . . ."), *aff'd,* 750 F.2d 1183 (3d Cir. 1984).

A bill of particulars is still more inappropriate when the Government supplements an indictment with extensive discovery. In this case, the United States has provided each of the defendants with extensive discovery, recorded conversations and draft transcripts of those calls, police reports, copies of search warrant affidavits, detailed reports documenting the execution of search warrants and a list of all physical evidence seized during the investigation. Additionally,

all tangible items seized during the investigation will be available for defense counsel to review whenever they choose to schedule an appointment with the case agent.  As the Fourth Circuit held in *United States v. SIGMA*, 624 F.2d 461, 466 (4th Cir. 1979), such "extensive disclosure by the Government" renders a bill of particulars inappropriate.

Moreover, the indictment complies with the requirement that all essential elements of the alleged crimes be plead.  Therefore, in light of the case law and the specific circumstances of this case, a bill of particulars simply is not warranted.

**(C)     The Motion To Dismiss Should Be Denied.**

Defendant Cannady has filed a motion to dismiss the indictment, (Docket # 116), which defendant Sampson specifically seeks to adopt. (Docket # 121).  To the extent other defendants have filed boiler plate motions to adopt the motions filed by the co-defendants, arguably they also seek dismissal of the indictment.

Cannady first argues that the Count One, the conspiracy count, should be dismissed because (1) a defendant cannot be convicted for conspiring only with a government agent; and (2) if the relationship between Barrett and Cannady was merely one of a buyer-seller, that standing alone is insufficient to support a conviction for conspiracy.  While Cannady sets forth correct statements of law, his arguments fail for several reasons.

The Government's evidence will establish that Barrett did not become a cooperator (government agent) until his arrest on August 6, 2014.  Prior to that time he had an ongoing relationship, not as a government agent, but rather as a partner in crime with each of the defendants, including Cannady and Sampson dating back months before their arrests in August, 2014.  During this time, Barrett sold significant quantities of cocaine and or heroin to each of the named defendants.  <u>None</u> of these transactions were at the direction of law enforcement.  Rather, the Government's evidence will show it was during this time period, that each of the defendants

conspired with Barrett and each other[2] to possess with the intent to distribute and distribute kilogram quantities of cocaine and heroin, which they in turn sold in the Baltimore metropolitan area.

The Fourth Circuit has held that a conspiracy can even be a "loosely-knit association of members linked only by their mutual interest in sustaining the overall enterprise of catering to the ultimate demands of a particular drug consumption market...."  *United States v. Banks*, 10 F.3d 1044, 1054 (4th Cir. 1993).  Accordingly, a defendant need not know an organization's structure, or the identities of all of the co-conspirators, in order to be considered a member of the conspiracy.  *Id.  United States v. Green*, 599 Fed. 3d. 360, 367 (4th Cir. 2010) (the Government is not required to prove that a defendant knew all his co-conspirators or all of the details of the conspiracy; *see also United States v. Tarantino,* 846 F.2d 1384, 1392 (D.C. Cir. 1988) (the government need not prove a direct connection between all co-conspirators).

As for the claim that the relationship between Barrett and Cannady and/or Sampson was merely one of buyer-seller, the Government's evidence will show that Cannady, Sampson, as well as the other co-defendants, acquired substantial quantities of narcotics for resale multiple times over an extended period of time.  *United States v. Reid,* 523 F.3d 310, 317 (4th Cir.2008) (holding that continued relationships and repeated drug transactions between parties are indicative of a conspiracy, particularly when the transactions involve substantial amounts of drugs).  Evidence of a "buy-sell transaction ... coupled with a substantial quantity of drugs, would support a reasonable inference that the parties were coconspirators."  *United States v. Mills,* 995 F.2d 480, 485 n. 1 (4th Cir.1993).  Likewise, evidence of continuing relationships and repeated transactions can support the finding that there was a conspiracy, especially when

---

[2] On the day he was arrested, Cannady and Parker came together to acquire kilogram quantities of narcotics from Barrett, as did Brown and Hopkins and Washington and Cooper.

coupled with substantial quantities of drugs.  *United States v. Burgos,* 94 F.3d  849, 858 (4th Cir.

1996).  Indeed, in *United States v. Hackley*, 662 F.3d 671, 679 (4th Cir. 2011) the Fourth Circuit

held that evidence of a buying or selling a substantial quantity of drugs over a short period of

time is enough to raise an inference of a distribution conspiracy.

     The Government anticipates that the evidence will not only show that substantial

quantities of narcotics were acquired by the defendants over a several month period, but for

several of the defendants, including Cannady, on occasion drugs were 'fronted' or given on

consignment.  As the Fourth Circuit held in *United States v. Edmonds,* 679 F.3d 169, 174 (4th

Cir.2012), "a transaction involving a consignment arrangement or the 'fronting' of drugs

indicates conspiracy to engage in drug trafficking beyond the immediate distribution

transaction." *Id.*  Thus, it cannot be seriously argued that the relationship between Barrett and

the defendants was merely that of a buyer and seller.

     Cannady also seeks to dismiss Count Three, the attempt charge, arguing that Cannady did

not take any substantial action which would constitute an attempt.  Cannady acknowledges that

in determining whether a defendant's conduct amounted to an attempt, as opposed to mere

preparation, the trial court must assess the likelihood that a crime would have been committed, at

least in the mind of Cannady, had intervening circumstances not occurred.  *See* Cannady's

memorandum, Docket # 16-1 at 3-4.  As the Fourth Circuit held in *United States v. Neal*, 78 F.

3d 901, 906 (4th Cir. 1996), the analysis of whether the conduct constitutes a substantial step or

mere preparation is by necessity one that is fact intensive and must be determined on a case by

case basis.  *Id.*

     The Government anticipates its evidence will show that Barrett had dealt with Cannady

over a several month period "fronting" kilogram quantities of cocaine and heroin.  On the day in

question, August 11, 2014, Cannady, along with a co-defendant, Parker, arrived at an agreed

upon location to acquire kilogram quantities of both cocaine and heroin and were arrested. While in his motion to dismiss, Cannady makes reference to part of a recorded conversation between Barrett and Cannady at 9:27 am on August 11, 2014, he conveniently overlooks, or ignores, the portion in that very same conversation where he told Barrett, "You gotta make sure that ah, that it's both man." (A reference to wanting both cocaine and heroin).  Later on in that same conversation, Cannady told Barrett, "You gotta meet up with me 'cause I gotta let you.., I gotta run these prices down to you.  You feel what I'm sayin?"  In a subsequent call at 12:10 pm on August 11, 2014, Cannady asked Barrett, "what's the phone number?" (A reference to the price of the drugs).  To which Barrett replied, "Thirty-Eight." Cannady then said, "Okay, all right."  Barrett then in the same conversation told Cannady "Three seven for y'all.  Don't tell nobody else that…, that…, that number though."  To which Cannady replied, "Okay, I ain't tellin…No. I'm …Okay, all right, I…, I'm gonna…, Oh, okay. All right."  Less than one hour later, Cannady and Parker arrived at the meet location to acquire cocaine and heroin from Barrett and were arrested.  Lest there be any doubt as to what Cannady was attempting to purchase, both his words and actions made it clear.  Indeed, as the Fourth Circuit noted in *United States v. Pratt,* 351 F.3d 131, 136 (4th Cir. 2003), a specific discussion could be so final in nature that it left little doubt that a crime was intended and would be committed.

The Fourth Circuit in *United States v. Engle*, 676 F.3d 405, 423 (4th Cir. 2012), has held that for purposes of the crime of attempt, a substantial step is a direct act in a course of conduct planned to culminate in commission of a crime that is strongly corroborative of the defendant's criminal purpose, citing *Pratt,* 351 F.3d at 135.  In determining whether a defendant has taken a substantial step, "the focus is on the actions already taken to complete the underlying crime, *not* on the acts that remain uncompleted," *United States v. Sanchez,* 615 F.3d 836, 844 (7th Cir.2010) (emphasis in original), and "a court must assess how probable it would have been that

13

the crime would have been committed—at least as perceived by the defendant—had intervening circumstances not occurred," *Pratt,* 351 F.3d at 136.  Here, but for both Barrett being arrested and no longer in possession of the narcotics and Cannady being arrested, the crime would have been completed.  And, as Cannady concedes, factual impossibility is not a defense to a charge of attempt.  *United States v. Williams,* 553 U.S. 285, 300, (2008); *U.S. v. Hamrick*, 43 Fed. 3d 877, 885 (4th Cir. 1995);  *See also*, *United States v. Crow,* 164 F.3d 229, 236 (5th Cir.1999) ("factual impossibility is not a defense if the crime could have been committed had the attendant circumstances been as the actor believed them to be").

Similarly, on August 11, 2014, Barrett made multiple consensually recorded calls in which Sampson indicated a desire to purchase one kilogram of heroin and one kilogram of cocaine.  Sampson stated, "I need to see you bad!"  To which Barrett replied, "I got you, I got you…On both."  Barrett advised law enforcement that "both" was a reference to heroin and cocaine.  Barrett told Sampson, "75 for the…you know which one…and I'm a say about 38, since it's a drought on the other thing."  Sampson replied, "Alright, cool.  Thank you."  Barrett later stated, "I'm going to let you go one on one."  Barrett explained to law enforcement that he provided a price of $75,000 for a kilogram of heroin and $38,000 for a kilogram of cocaine and that he was going to provide Sampson with one kilogram of each.  At approximately 3:40 p.m., in another recorded call Sampson told Barrett, "I gotta put the word out as we speak…and I got some cash for when I see you."  Barrett informed law enforcement that Sampson indicated that he was calling up his buyers and trying to get as much money to give to Barrett as possible toward the purchase of the cocaine and heroin.

At approximately 4:29 p.m., Sampson arrived at the Ross parking lot, located at the Mondawmin Mall in Baltimore, parked his car, and walked over to the Target parking lot to meet

with Barrett.  Once Sampson approached Barrett's vehicle, he was placed under arrest by agents of the FBI.  A search of his person and of the vehicle revealed that Sampson brought approximately $10,500 in U.S. currency.  Again, but for both Barrett being arrested and no longer in possession of the narcotics and Sampson being arrested, the crime would have been completed.  For the reasons set forth above, Sampson's motion to dismiss should be denied as well.

**(D)   Motion To Adopt Motions Filed By Co-Defendants And Motion For Leave To File Additional Pre-Trial Motions.**

Although the Government does not object to these requests (Docket #s 103, 105, 110, 111, 121, 126, 127, 130), it is respectfully requesting that co-defendants adopting motions be required to particularize the basis for their adopting those motions to the extent that they are relying on grounds or authorities other than those set forth in the adopted motions.  To the extent that any defendant wishes to file additional motions, the Government does not object, provided there is a satisfactory explanation as to <u>why</u> the motion was required to be filed <u>after</u> the deadline and multiple extensions of the date set by the Court.

**(E)   Brown's And Agnant's Motions For Disclosure of Statements Of Co-Defendants And Co- Conspirators Intended To Be Used Pursuant To Fed. R. Evid. 801(d)(2)(E).**

Both Brown[3] and Agnant have filed a motion to compel the Government to identify, disclose and produce any statements of any co-defendant or co-conspirator that the prosecution intends to offer against Brown or Agnant, or any co-defendant under Federal Rule of Evidence 801(d)(2)(E).  (Docket #s  101, 125).  To the extent other co-defendants have filed boiler plate motions to adopt the motions filed by Brown and Agnant, arguably they join in this motion.

---

[3]  All of Brown's motions were filed by his former counsel, Michael Montemarano, Esquire.  Although Brown's substitute counsel, Ivan Bates, Esquire, has not indicated that he still wishes to pursue the motions filed by former counsel, the Government will address the motions nonetheless.

As part of discovery, statements made by any of the co-defendants in this case have already been turned over, including both recordings and draft transcripts.  Moreover, the Fourth Circuit has held that statements of conspirators is governed by the Jencks Act, 18 U.S.C. § 3500, rather than Federal Rule of Criminal Procedure 16(a)(1)(A).  Both Brown and Agnant's counsel have signed discovery agreements in which the parties agreed that Jencks material would be turned over one week prior to trial.  The Government intends to abide by the provisions of the discovery agreement.  Therefore, Brown and Agnant's motion is moot or, at best, premature.

**(F)      Brown's Motion for Disclosure Pursuant to Fed. R. Crim. P. 12.**

Brown has filed a motion to compel the Government to disclose its intention to use any evidence that may be subject to a motion to suppress under Federal Rules of Criminal Procedure 12(b)(3)(c) and 12(b)(4)(B) which provides that the defendant may, "in order to have an opportunity to move to suppress evidence under Rule 12(b)(3)(c), request notice of the government's intent to use (in its evidence-in-chief at trial) any evidence that the defendant may be entitled to discover under Rule 16."  (Docket # 99).  To the extent other co-defendants have filed boiler plate motions to adopt the motions filed by Brown, arguably they join in this motion.

Federal Rule of Criminal Procedure 12(b)(4)(B) has a limited purpose:

> Rule 12(b)(4)(B) is not designed or intended to be used to obtain more specific discovery than that provided by Rule 16 nor is it designed to aid the defendant in ascertaining the Government's trial strategy . . . Rather, Rule 12(b)(4)(B) is intended to facilitate efficient suppression motion practice by allowing the defendant to avoid filing a motion to suppress when the Government does not intend to use the evidence at issue.

*United States v. Barret*, 824 F. Supp. 2d 419, 459-60 (E.D.N.Y. 2011) (internal citations omitted).  *See also United States v. de la Cruz-Paulino*, 61 F.3d 986, 994 (1st Cir. 1995) (stating that Federal Rule of Criminal Procedure 12(b)(4)(B)'s predecessor Rule 12(d) "was not designed to aid the defendant in ascertaining the Government's trial strategy"); *United States v. Ishak*,

277 F.R.D. 156,158 (E.D. Va. 2011) ("Put differently, defendants cannot invoke Rule 12(b)(4)(B) 'to force the government to decide precisely which documents provided in discovery it will offer at trial and to prevent it from using any that it does not so designate as a matter of trial tactics.'").

Moreover, Federal Rule of Criminal Procedure 12(b)(4)(B)'s "core purpose is to ensure that a defendant '*can make his motion to suppress prior to trial*' by 'requesting the government to give notice of its intention to use *specified evidence* which the defendant is entitled to discover under rule 16.'" *Ishak*, 277 F.R.D. at 158. (emphasis in original).  Therefore, in order to trigger Rule 12(b)(4)(B)'s notice obligation, "the defendant's request must identify potentially suppressive evidence with specificity." *Id* at 159.  In *Ishak*, the court denied the defendants' requests under Rule 12(b)(4)(B) as being "insufficiently specific" because the defendants had simply requested that the government "designate its evidence and any calls, transcripts, and physical evidence pertaining to the defendant." *Id* at 159.

Here, Brown has specifically asked for (1) statements or "admissions by conduct" made by Brown, including during any polygraph; (2) items, objects or information received as the product of a search executed by government agents; (3) recordings made pursuant to wiretaps; (4) recordings made pursuant to consensual recordings; (5) pre-trial identification procedures including line-ups; (6) any evidence arguably obtained in violation of federal, state, or local law; (7) grand jury testimony that the Government has reason to suspect was perjured; and (8) any other information or material which might come under this rubric.  The Government has turned over in discovery items responsive to the first, second, fourth, and fifth specific requests.  The third specific request is inapplicable in this case.  The sixth and seventh specific requests fall within the Government's *Brady* and *Giglio* obligations.  The Government has complied with its

*Brady* and *Giglio* obligations and is aware of its ongoing responsibility to turn over such materials.

Regarding, the eighth request, it is simply too broad to comply with the requirements of Federal Rule of Criminal Procedure 12(b)(4)(B). Such a broad and vague request does not follow the purpose of Rule 12(b)(4)(B). Therefore, the eighth request in the motion should be denied as well.

### (G)   Brown's And Sampson's Motions To Require Prosecution To Review And Confirm Witness Backgrounds.

Brown has filed a motion to compel the Government to verify that it has "vetted" and "confirmed" the backgrounds, qualifications, honesty and other pedigree information of Government witnesses (Docket # 102), which defendant Sampson specifically seeks to adopt, (Docket # 121). To the extent other co-defendants have filed boiler plate motions to adopt the motions filed by Brown, arguably they join in this motion. The Government has complied with its *Brady* and *Giglio* obligations and is aware of its ongoing responsibility to turn over such materials. In addition, the Government will turn over *Jencks* material shortly before trial.

### (H)   Washington's And Sampson's Motion To Suppress In-Court And Out-of-Court Identification.

Washington has sought to suppress any identification of him by a FBI confidential source known as "CW-1" (Docket # 106), which defendant Sampson specifically seeks to adopt, (Docket # 121). CW-1 in fact is Michael Barrett.

With the exception of Washington and Cooper, all of the defendants, including Sampson, were arrested during daylight hours on August 11, 2014, at a pre-determined location arranged by Barrett. All had previously been supplied by Barrett with kilogram quantities of narcotics over a several month period. Barrett was able to visually identify each of the defendants, including Sampson, when they arrived to meet with Barrett.

In the case of Washington and Cooper, they, not Barrett, arranged the meet location, which turned out to be an apartment complex where Cooper worked part-time. The meeting occurred after several phone calls between Barrett and Cooper in which they agreed to acquire narcotics from Barrett. Barrett was quite familiar with both Cooper and Washington, having previously supplied them with kilogram quantities of cocaine as far back as November, 2013. Barrett knew both Washington and Cooper, by sight, as well as by their nicknames "Vito" (Cooper) and "Cuzzo" (Washington). Barrett also knew the type and color of the vehicles they drove, including the fact that the vehicles had DC license plates. Barrett described "Cuzzo" (Washington) as the financier for "Vito" (Cooper).

During the multiple calls leading up to their meeting, Cooper indicated to Barrett that he had told Washington that the price was higher than listed by Barrett and that Barrett should keep the extra money on the side to be collected by Cooper at a later date. Barrett explained to FBI S/A Eric Nye that Cooper often told Washington that the price was higher so that he could, with the help of Barrett, steal money from Washington. This further corroborated the initial assessment, by Barrett, that Washington financed all of the drug deals coordinated by Cooper with Barrett. Barrett also indicated that Washington always supervised the drug deals as he was financing them.

When agents observed Cooper and Washington arrive at the apartment, Barrett placed a call to Cooper in which Cooper indicated that he was in the right side apartment (the building has two entrances and Cooper was referring to being in the right side of the apartment building). Agents entered the parking lot and both Cooper and Washington were arrested. Because it was dark when both Washington and Cooper arrived in their separate vehicles, Barrett was unable to visually identify them, as he had the other defendants. Upon both Washington and Cooper being arrested, identification was obtained from both in the form of drivers' licenses. FBI S/A Nye

showed Barrett only the faces depicted on the licenses, covering up the names and any other identifiers.  Upon being shown the faces on the licenses, Barrett positively identified both as "Vito (Cooper) and "Cuzzo" (Washington).  At no time was Barrett shown any other identifiers on the drivers' licenses.

Barrett, as a result of selling narcotics to both Cooper and Washington had multiple occasions over a more than nine month period to be physically present with Cooper and Washington and had ample opportunity to observe them.  The fact that he was shown a single photo of them by the FBI was done to confirm the individuals he saw, knew, and dealt with and whom he knew by the names "Vito" and "Cuzzo" were in fact Cooper and Washington.

To the extent that Washington objects to the use of pretrial identification as evidence at trial or to testimony about pretrial identification, he must first show that the identification procedure was impermissibly suggestive.  *Manson v. Braithwaite*, 432 U.S. 98, 114 (1977).  Again, Barrett had ample and repeated opportunities to observe Cooper and Washington.  Reliability, not the showing of the photograph is the linchpin in determining admissibility of identification testimony.  The factors to be considered are set out in *Neil v. Biggers,* 409 U.S. 188, 199-200 (1972).  These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.  Against these factors is to be weighed any alleged corrupting effect of the showing of the single photograph.  *See United States v. Johnson*, 114 F.3d 435, 442 (4th Cir. 1997) (in court identification permitted notwithstanding unduly suggestive single photograph display where witness had adequate opportunity to observe defendant).  Furthermore, "[t]he exclusion of evidence from the jury is, however, a drastic sanction, one that is limited to identification testimony which is manifestly suspect."  *Harker v. Maryland*, 800 F.2d 437, 443

(4th Cir. 1986).  Evidence that is not so impermissibly suggestive as to give rise to a substantial likelihood of irreparable identification is for the jury to weigh, as "evidence with some element of untrustworthiness is customary grist for the jury mill." *Manson*, 432 U.S. at 116.  Given the opportunity Barrett had to observe Washington, his motion, as well as that adopted by Sampson, to suppress both in-court and out-of-court identification should be denied.

### (I)     MOTION FOR DISCLOSURE PURSUANT TO RULE 404(b) AND RULE 609.

Defendants Agnant, Brown, Cannady, Sampson and Washington have filed motions for disclosure of 404 (b) and 609 evidence (Docket #s 100, 109, 115, 121, 125).  Defendant Parker, to the extent that he filed a motion to adopt motions filed by co-defendants (Docket # 130) arguably has joined this motion as well.  Defendants Agnant, Cannady, Sampson, and Washington all have at least one prior felony drug conviction.  The Government intends to adduce these prior convictions evidence at trial pursuant to Federal Rules of Evidence 404(b) and 609.

### *THE PRIOR CONVICTIONS*

Washington:  On February 19, 1992, Washington was charged in U.S. District Court in Washington, D.C. with possession with intent to distribute both cocaine and cocaine base.  He was sentenced on October1, 1992, to a term of imprisonment in the Bureau of Prisons to 151 months.  Upon completing that sentence, Washington was arrested again on federal drug charges in the District of Columbia for possession with the intent to distribute cocaine base.  He was sentenced on January 30, 2009 to 60 months at the Bureau of Prisons.  Upon being released, Washington was placed on supervised release and there is presently a violation of that supervised release pending.

Cannady:  Cannady was arrested on October 5, 1998, and charged in the U.S. District Court of Maryland with conspiracy to distribute heroin.  He was sentenced on April 30, 1999 to a term of imprisonment of 152 months to the Bureau of Prisons.  While at the Bureau of Prisons, Cannady was charged and convicted of assault and given a 46 month sentence to be served consecutively to his federal felony drug conviction.  Cannady was released from the Bureau of Prisons on May 10, 2013.  He is presently facing violations of supervised release in both cases.

Agnant:  On October 17, 2001, Agnant was sentenced to 10 years, with all but 30 months suspended, in connection with his conviction in the Circuit Court for Prince Georges County for Manufacture/distribution of cocaine.  Agnant was paroled on June 20, 2002, but on November 30, 2004 he was charged and ultimately convicted of involuntary manslaughter as he fled from the police in the District of Columbia, running a red light and fatally injuring the driver of another vehicle.  It appears the police were pursuing him in connection with a narcotics violation.  Agnant abandoned his vehicle from which the police recovered a handgun.  Agnant was sentenced in U.S. District Court on January 5, 2006 to a sentence of 100 months and was released from the Bureau of Prisons on March 19, 2013 and placed on supervised release.  He currently is facing a violation of his supervised release.

Sampson:  Sampson was arrested on January 210, 2004 and charged in the U.S. District Court of Maryland with conspiracy to distribute heroin.  On April 29, 2005, he was sentenced to 140 months.  Upon his release he was placed on supervised release beginning November 8, 2013.  There is presently a violation of supervised release pending for Sampson as well.

Given that Washington, Cannady, Agnant and Sampson have entered pleas of not guilty in the instant case, they have placed squarely before the jury each and every element of the crimes with which they have been charged.  Specifically, as to Count One, the Government is required to prove beyond a reasonable doubt that Washington, Cannady, Agnant and Sampson

(and others) conspired to distribute both cocaine and or heroin; and in Counts Two, Three, Four, and Eight, that Washington, Cannady, Agnant and Sampson attempted to possess with intent to distribute cocaine and or heroin.

Rule 404(b) permits the admission of extrinsic acts where they are (1) relevant to an issue other than character, (2) necessary, and (3) reliable. *United States v. Mark*, 943 F.2d 444, 447 (4th Cir. 1991). The Fourth Circuit has long held that Rule 404(b) is an <u>inclusionary</u> rule that permits the admission of all evidence of other crimes relevant to an issue in a trial, except that which tends to prove only criminal disposition. *United States v. Sanchez*, 118 F.3d 192, 195 (4th Cir. 1997); *United States v. McMillon*, 14 F.3d 948, 953 (4th Cir. 1994); *United States v. Bailey*, 990 F.2d 119, 121 (4th Cir. 1993); *Mark*, 943 F.2d at 447; *United States v. Watford*, 894 F.2d 665, 671 (4th Cir. 1990); *United States v. Masters*, 622 F.2d 83, 85 & n.2 (4th Cir. 1980). Moreover, courts have held that the admission of "other crimes" evidence under Rule 404(b) is particularly appropriate where, as in the case here, criminal intent or knowledge is at issue. *See Huddleston v. United States*, 485 U.S. 681, 685 (1988) (finding that "extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct"); *United States v. Queen*, 132 F.3d 991, 996 (4th Cir. 1997), (finding that "[o]nce an act is assumed to be done, 'the prior doing of other similar acts . . . is useful as reducing the possibility that the act in question was done with innocent intent."). The trial court has broad discretion with respect to the admission of extrinsic act evidence, and the Court of Appeals will defer to the lower court's decision "unless it is an arbitrary or irrational exercise of discretion." *United States v. Greenwood*, 769 F.2d 49, 53 (4th Cir. 1986).

The Fourth Circuit has established a three part test to determine whether extrinsic act evidence is admissible under Fed. R. Evid. 404(b). The evidence is admissible if the court finds

that (1) the evidence is relevant to some issue other than character; (2) it is necessary; and (3) it is reliable.  *Queen*, 132 F.3d at 997 ; *United States v. Rawle*, 845 F.2d 1244, 1247 (4th Cir. 1988); *United States v. Hadaway*, 681 F.2d 214, 217 (4th Cir. 1982).  Once the threshold requirements of Rule 404(b) are met, the Court must then consider whether the probative value of the evidence is outweighed by the potential for unfair prejudice under Rule 403.  *Mark*, 943 F.2d at 448; *Masters*, 622 F.2d at 87.

*(1) The Evidence is Relevant.*

Here, the proffered evidence meets all three parts of the Fourth Circuit's test for admissibility under Rule 404(b).  The evidence of prior drug trafficking activities by Washington, Cannady, Agnant and Sampson is relevant because it is probative with regard to both their knowledge and intent.  A defendant's knowledge and intent are elements which the prosecution must prove to establish possession with intent to distribute narcotics in violation of 21 U.S.C. § 841(a)(1).  *Mark*, 943 F.2d at 448.  These elements are placed in issue in a narcotics case simply by a plea of not guilty.  *Sanchez*, 118 F.3d at 195; *United States v. Brewer*, 1 F.3d 1430, 1433 (4th Cir. 1993); *see also United States v. McLamb*, 985 F.2d 1284, 1289 (4th Cir. 1983) (plea of not guilty places defendant's state of mind in issue).

Evidence that Washington, Cannady, Agnant and Sampson have previously been convicted of conspiracy and possession with the intent to distribute controlled substances is plainly relevant to establish both knowledge and their intention to conspire to distribute narcotics, as alleged in Count One; and the attempted possession with the intent to distribute narcotics as alleged in Counts Two, Three, Four, and Eight.

In *Mark*, the defendant was charged with participation in a 1989 narcotics trafficking conspiracy involving the sale of five kilograms of cocaine to an undercover DEA agent.  As part of the conspiracy, Mark traveled with a co-conspirator in a BMW automobile (containing a large

amount of cash) to a hotel where they were to pay for and pick up the cocaine from the undercover agent, with the intention to thereafter deliver it to an awaiting buyer.  Prior to reaching the hotel, the co-conspirator dropped Mark off at a nearby gas station, where he was to be picked up after the sale was consummated.  The co-conspirator was arrested at the hotel.  Mark and the buyer were subsequently arrested by police.  Mark admitted to police that he rode in the BMW with the co-conspirator and that he knew that there was a large amount of money in the car, but he denied any involvement in the drug transaction.  *Mark*, 943 F.2d at 446-47.

During the Government's case in chief, the district court allowed the prosecution to admit evidence under Rule 404(b) of the defendant's prior cocaine dealing activities beginning in 1984, five years prior to the date of the charged conspiracy.  The 404(b) evidence in that case showed that in a five year period prior to the indictment, the defendant distributed between 80-100 kilograms of cocaine, and it was admitted to show Mark's intent and knowledge with respect to the charged conspiracy.  *Mark,* 943 F.2d at 448.

The Fourth Circuit affirmed, noting that the Rule 404(b) evidence was relevant and admissible to show Mark's intent and knowledge.  The Court in *Mark* stressed that the evidence was necessary inasmuch as it supported the prosecution's central theory that Mark was not an innocent rider in the BMW, but rather a drug dealer who knowingly participated in a cocaine distribution conspiracy.  *Id*.

In this case, as in *Mark*, evidence of prior convictions for conspiracy, and the attempted possession with intent to distribute narcotics is necessary to prove intent and knowledge and to rebut any suggestion by Washington, Cannady, Agnant and Sampson that they were not aware of the nature of the substances they are alleged to have conspired to possess; that they lacked the intent to conspire to distribute; or that they did not attempt to possess narcotics.

Case law from the Fourth Circuit as well as all other circuits supports the proposition that both prior and subsequent narcotics trafficking activities are admissible under Rule 404(b) in a narcotics prosecution to prove knowledge, intent, and lack of mistake.  *See Sanchez*, 118 F.3d at 195 (evidence of prior cocaine dealing admissible to show defendant's knowledge and intent in narcotics conspiracy case);  *United States v. Ramey*, 791 F.2d 317, 323 (4th Cir. 1986) (evidence of prior marijuana trafficking admissible to show intent in subsequent marijuana prosecution); *Rawle*, 845 F.2d at 1246-47 (allowing admission of prior marijuana dealing in subsequent marijuana prosecution); *United States v. King*, 768 F.2d 586 (4th Cir. 1985)  (allowing evidence of prior cocaine convictions in prosecution for possession with intent to distribute PCP); *United States v. Hines*, 717 F.2d 1481, 1489 (4th Cir. 1983) (evidence of prior marijuana dealing and subsequent cocaine distribution admissible to show intent in cocaine conspiracy).

*(2) The Evidence is Necessary.*

The element of necessity is likewise met here.  Evidence is necessary and admissible where it supplies useful proof of the elements of knowledge and intent.  *Hadaway*, 681 F.2d at 218; see also *Mark*, *supra*.  Here, the 404(b) evidence is necessary to show knowledge and intent and to show a lack of accident or mistake.  As noted above, Washington, Cannady, Agnant and Sampson may attempt to disavow any knowledge of the conspiracy or their membership in the conspiracy, as well as claim they had no intention to possess narcotics.  *See e.g.,* Cannady's motion to dismiss (Docket # 116-1 at 3-6).  The Government accordingly should be permitted to adduce all relevant evidence on the issue of Washington's, Cannady's, Agnant's and Sampson's knowledge and intent and lack of accident or mistake.

*(3) The Evidence is Reliable.*

Finally, the proffered evidence here satisfies the element of reliability.  The evidence that led to Washington's, Cannady's, Agnant's and Sampson's convictions established their guilt

26

beyond a reasonable doubt.  Rule 404 (b) merely requires proof of the occurrences of the underlying acts by a preponderance of the evidence.  *See Huddleston, 4*85 U.S. at 682 (standard of proof for prior acts under Rule 404(b) is preponderance of the evidence).  For all of these reasons, the Government's proffered extrinsic act evidence meets the requirements for admissibility under Rule 404(b).

Furthermore, there is no rule that states how many years will render a prior conviction stale for purposes of Rule 404(b) admissibility.  *United States v. Engleman*, 648 F.2d 473, 479 (8th Cir. 1981).  Indeed, the Fourth Circuit has affirmed district courts' decisions to admit 404(b) evidence of significantly older convictions than the ones at issue here.  *See United States v. Kelly*, 510 F.3d 433, 437 (4th Cir. 2007) (holding that conviction occurring twenty-two years prior was admissible because similarities between charged offense and prior crime were significant and lapse of time alone did not render  conviction inadmissible); *Queen*, 132 F.3d at 998 (finding nine year-old evidence of intent probative despite lapse of time "particularly when the defendant has spent many of those intervening nine years in prison"); *United States v. Morton*, 461 Fed. Appx. 252 (4th Cir.) (unpublished) (30 year-old prior conviction admissible under 404(b)), *cert. denied*, 132 S. Ct. 2416 (2012).  *See also United States v. White*, 519 Fed. Appx. 797, 806 (4th Cir. 2013) which affirmed <u>this</u> Court's ruling that the 404(b) evidence was admissible: "Thomas' and White's prior convictions were similar to the charges they faced in this case.  Such evidence was therefore relevant to whether they possessed the requisite knowledge and intent to commit the narcotics crimes with which they were charged." *Id*

*The Evidence is Not Unduly Prejudicial.*

Once evidence of extrinsic acts is found to be admissible under Rule 404(b), the Court must still consider whether its probative value is substantially outweighed by its prejudicial effect.  *Morgan v. Foretich*, 846 F.2d 941, 944 (4th Cir. 1988).  Evidence found to be relevant

and probative under Rule 404(b) should be excluded under Rule 403 only in those instances

where the trial judge believes there is a genuine risk that the emotions of the jury will be excited

to irrational behavior, and that this risk is disproportionate to the probative value of the proffered

evidence.  *Id*. at 945; *see also United States v. Powers*, 59 F.3d 1460 (4th Cir. 1995) (evidence

that defendant repeatedly raped his daughter was not unduly prejudicial and hence was

admissible under Rule 404(b) in prosecution for aggravated sexual abuse of a minor – evidence

was highly probative and judge gave limiting instruction thereby obviating potential for

prejudice); Bailey, 990 F.2d at 123; *United States v. Masters*, 622 F.2d 83, 87 (4th Cir. 1980).

"Rule 403 is a rule of <u>inclusion</u>, generally favoring admissibility."  *United States v. Udeozor*, 515

F.3d 260, 264-65 (4th Cir. 2008) (internal quotation marks and alteration omitted) (emphasis

added).  Where the evidence is probative, "the balance under Rule 403 should be struck in favor

of admissibility, and evidence should be excluded only sparingly."  *United States v. Lentz*, 524

F.3d 501, 525 (4th Cir. 2008).

It is also clear under Fourth Circuit case law that the admission of extrinsic act evidence

does not result in unfair prejudice under Rule 403 where it does not involve conduct any more

sensational or disturbing than the crimes with which the defendant was charged.  *United States v.

Boyd*, 53 F.3d 631, 637 (4th Cir. 1995); *see also United States v. Pitre*, 960 F.2d 1112, 1120 (2d

Cir. 1992); *United States v. Roldan Zapata*, 916 F.2d 795, 804 (2d Cir. 1990).  Here, the

extrinsic act evidence merely involves allegations of additional acts of conspiracy to distribute,

distribution, and possession with the intent to distribute controlled dangerous substances – the

same type of allegations that are the subject of the indictment itself.  It is inconceivable that this

additional evidence would evoke such an emotional reaction against the Defendants that the jury

would be excited to irrational behavior.  *Mark*, 943 F.2d at 449 n.1.

28

The extrinsic act evidence relating to other narcotics violations by Washington, Cannady, Agnant and Sampson is therefore admissible under both Rule 404(b) and Rule 403.  The Government would request that the Court give the jury a cautionary instruction concerning the permissible uses of extrinsic act evidence, both when the evidence is admitted and then again at the close of the case.  *See Powers*, 59 F.3d at 1467 ("[A]s to prejudicial effect, cautionary or limiting instructions generally obviate any such prejudice.").

### (J)    Brown's Motion To Exclude Evidence Not Disclosed Pursuant To The Terms Of The Discovery Agreement

Brown has filed a motion to exclude evidence not disclosed pursuant to the terms of the discovery agreement.  That motion has been adopted by Sampson.  In his motion, Brown complains about *inter alia*, lack of 404(b) information, *Jencks* materials and expert notice. In this consolidated motion response, the Government has given notice as to 404(b) information, which in point of fact does not even pertain to Brown. The Government is well aware of its obligations. At this time, the Government intends to call as an expert witness the DEA forensic chemist who analyzed the suspected cocaine and heroin seized from Barrett.  That report has not yet been completed, but defense counsel have been provided information showing that field tests of the substances seized from Barrett on August 6, 2014 tested positive for cocaine and heroin.  Upon the Government's receipt of the DEA lab report it will be immediately provided to the defendants, along with the CV of the chemist who analyzed the narcotics.  To the extent that Brown is requesting *Jencks* material at this time, the request should be denied.  As Brown's counsel surely know, *Jencks* material is not discoverable until <u>after</u> the relevant witness testifies. Indeed, Title 18 U.S.C. § 3500(a) expressly provides:

> In any criminal prosecution brought by the United States, no statement or report in possession of the United States, which was made by a Government witness or prospective Government witness (other than the

> defendant) shall be the subject of . . . discovery . . . or inspection until said
> witness has testified on direct examination in the trial of the case.

18 U.S.C. § 3500; *see also* Fed. R. Crim. P. 26.2 (requiring disclosure only after the witness

testifies).  In interpreting the *Jencks* Act, the Fourth Circuit has stated, again and again, that a

district court "may not require the government to produce Jencks Act material relating to one of

its witnesses until after a witness has testified."  *United States v. Lewis*, 35 F.3d 148, 151 (4th

Cir. 1994); *United States v. Peterson*, 524 F.2d 167, 175 (4th Cir. 1975), (noting that "a Jencks

Act request is wholly inappropriate in a pretrial motion for discovery"); *United States v. Trevino*,

89 F.3d 187, 189 n.2 (4th Cir. 1996).  Accordingly, any request for materials which falls within

the scope of the *Jencks* Act or Rule 26.2 should be denied.  The Government, however, will

provide *Jencks* material at the appropriate time, consistent with the discovery agreements.

Without any showing that the Government has neglected its obligations with regard to its

discovery obligations, this motion should be denied.

### (K)    MOTIONS TO SUPPRESS STATEMENTS AND TANGIBLE EVIDENCE.

Defendants Cannady, Parker, and Agnant have filed motions to suppress statements made to law

enforcement.  (Docket #s 113, 124, 130).  Defendants Cannady, Sampson, Parker, Agnant, and

Washington have also filed motions to suppress tangible evidence seized by the Government that

the Government intends to use at trial.  (Docket #s 107, 114, 122, 124, 130).  To the extent other

defendants have filed boiler plate motions to adopt the motions filed by the co-defendants,

arguably they also seek to suppress statements and tangible evidence.  Although several

defendants have moved to suppress statements, Agnant was the only defendant who made

statements to law enforcement.  Agnant contends that the statements were obtained unlawfully.

Agnant's contentions are incorrect.  Further, defendants Cannady, Sampson, Parker, Agnant, and

Washington contend that the tangible evidence was seized without consent or probable cause. These contentions are incorrect.

 (1)    *Agnant's Motion to Suppress Statements Should Be Denied.*

Agnant has moved to suppress any statements that may have been made by him to law enforcement officials that the Government intends to use at trial, claiming they were obtained unlawfully.  The Government seeks to introduce statements made by the Agnant after he was arrested and was being transported to the FBI Baltimore Field Office as well as statements made to law enforcement during a post-arrest interview.  Agnant was arrested at the Mondawmin Mall. As soon as officers departed the mall with Agnant, Agnant stated not in response to questioning, "I knew I should not have come," and "I knew something was up."  He further stated that he received a telephone call from his "P.O." (probation officer) this morning and she asked him if he had been picked up by the FBI this morning.  Agnant told his P.O. that he had not been picked up by the FBI.  Agnant further stated that his P.O. had called him back and said that there was a mistake and to forget about it.  Agnant stated that he thought it was weird because his P.O. never calls him.  When officers asked Agnant who his probation officer was, Agnant replied "Duncan."[4]  No other statements were made during the transport.  Subsequently, while at the FBI's field office, Agnant was advised of his *Miranda*[5] warnings and signed the Advice of Rights form, waiving his right for a lawyer to be present during the interview.  **Exhibit 1.** Agnant was then questioned by investigators.  Agnant stated that prior to his arrest, he was going to meet "Mike" to look at some "product," and that "Mike" had called him prior to the meeting. Agnant stated that he did not understand why he was arrested since he did not have any money

---

[4] The Government does not intent to introduce Agnant's response to the officer's question regarding his probation officer and who was Agnant's probation officer.

[5] *Miranda v. Arizona,* 384 U.S. 436 (1966)

on him at the time of the arrest.  Agnant further stated that he met "Mike" while doing time at Allenwood (federal correctional institution) in 2010.[6]  When asked if the "product" that Agnant was meeting Mike for was heroin, Agnant replied, "I don't know anything about no heroin." When asked whether the product was cocaine, Agnant did not respond.  Agnant explained that he did not have money to purchase the "product" at the time of the meeting with "Mike."  Agnant stated that he was going to see the "product" first and then was going to go home to get the money before he could come back for the "product."

Agnant's initial statements were not made in response to questioning but rather constituted a blurt or volunteered statement for which *Miranda* is not implicated.  *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980.  *Accord Estelle v. Smith*, 451 U.S. 454, 469 (1981); *United States v. Monteith*, 662 F.3d 660,669 (4th Cir. 2011); *United States v. Wright*, 991 F.2d 1182, 1186 (4th Cir.1993); and *United States v. Rhodes*, 779 F.2d 1019, 1032 (4th Cir. 1985).

With regard to the post arrest statements in response to questioning, having been advised of his *Miranda* warnings, the only remaining issue concerns the voluntariness of the Defendant's statements.  "A statement is involuntary under the Fifth Amendment only if it is involuntary within the meaning of the Due Process Clause."  *United States v. Braxton,* 112 F.3d 777, 780 (4th Cir. 1997) (en banc).  For a statement to be involuntary under the Due Process Clause, it must be "extracted by ... threats or violence;" or "obtained by ... direct or implied promises" or "the exertion of ... improper influence."  *Braxton*, 112 F.3d at 780.  A statement following *Miranda* warnings is "rare[ly] be deemed involuntary," *Dickerson v. United States,* 530 U.S. 428, 444 (2000).

In determining voluntariness, the crucial inquiry in whether the subject's will has been

---

[6] The Government will not be seeking to introduce <u>where</u> Agnant met Barrett, only <u>when</u>.

"overborne" or his "capacity for self-determination critically impaired." *United States v. Pelton*, 835 F.2d 1067, 1071-72 (4th Cir. 1987). *See also Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973); *United States v. Photogrammetric Data Services*, 259 F.3d 229, 241-42 (4th Cir. 2001); *Braxton*, 112 F.3d at 781; and *United States v. Wertz*, 625 F.2d 1128, 1134 (4th Cir. 1980).  The Court also examines "the totality of the circumstances," including the defendant's individual characteristics and background, the setting in which the statement occurred, and the details of the interrogation or interview.  *United States v. Elie*, 111 F.3d 1135,1143-44 (4th Cir. 1997); *Pelton*, 835 F.2d at 1071.  *Accord*, *United States v. Van Metre,* 150 F.3d 339, 348-49 (4th Cir. 1998). There has been no credible claim, nor can there be, that the Defendant's statements were not voluntary under the Fifth Amendment in violation of *Miranda*. Accordingly, his statements to the investigators are admissible.

> *(2)   Motion to Suppress Statements Made to Michael Barrett Should Be Denied.*

To the extent the defendants have moved to suppress any recorded statements made to a confidential informant, their motions should be denied.  These statements were all made with one-party consent pursuant to law enforcement purposes and therefore were lawful.  *See* 18 U.S.C. § 2511(2)(c) ("It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such party is a party to the communication or one of the parties to the communication has given prior consent to such interception."); *see e.g., United States v. Caceres*, 440 U.S. 741, 749-50 (1979) (holding that consensual recordings do not violate an unwitting participant's statutory or constitutional rights). Because the recorded statements were lawful, any motion to suppress should be denied.

> *(3)   Tangible Evidence.*

Defendants Cannady, Sampson, Parker, Agnant, and Washington have also moved to suppress items seized from their persons and vehicles during their August 11, 2014 arrests by

law enforcement that the Government intends to introduce at trial, claiming that they were seized without consent or probable cause.  Further, Agnant moves to suppress items seized from 3539 Emperor Court, Bowie, Maryland 20716 ("3539 Emperor Court") on August 13, 2014, pursuant to a search and seizure warrant.  Because the Government does not intend to introduce any evidence seized from 3539 Emperor Court, the motion to suppress is moot.

All of the defendants were arrested during on August 11, 2014, at a pre-determined location.  All had previously been supplied by Barrett with kilogram quantities of narcotics over a several month period.  The facts and circumstances of each defendant's arrest will be discussed below.

Cannady and Parker:  On August 6, 2014, during a phone conversation between Cannady and Barrett, Cannady stated to Barrett, "I was just checkin' on . . . , you feel what I'm sayin'?" Barrett said, "Yeah," to which Cannady responded, "So you'll call me early in the morning?" Barrett told Cannady, "Yeah, probably. . . , probably tomorrow.  I don't know 'cause they wanna see me in the morning.  Probably like tomorrow afternoon or something' I'll probably get up with you."  On August 11, 2014 at 9:27 a.m., in a phone conversation between Cannady and Barrett, the two agreed to meet up.  In the call, Cannady told Barrett, "You gotta make sure that ah, that it's both man."  Barrett, understanding Cannady to mean both cocaine and heroin, responded, "Of course . . . hey, hey . . . A-1."  Canndy replied with a slight laugh, "I already know."  Later, at 12:10 p.m., in a phone conversation between Cannady and Barrett, Cannady asked, "Hey, what's the ah…, what's . . ., what's the phone number?"  Barrett responded, "Thirty-eight," meaning $38,000 for one kilogram of cocaine.  Cannady stated, "Okay, all right." Barrett later reduced the prices and stated, "Three seven for ya'll.  Don't tell nobody else that . . . , that . . ., that . . . , that number though."  At 12:21 p.m., Barrett told Cannady in a separate phone conversation for Cannady and "Nick" (meaning Dominic Parker) to give Barrett "like a

hour or something and then I'm a call you right back and just tell you where to come and then I'll just deal with ya'll."  In a later call at 12;41 p.m. between Barrett, Canandy, and Parker, Parker told Barrett they would be ten minutes and Barrett told Cannady that they should meet him at the Target and that Barrett would be in the rental car.  At approximately 1:02 p.m., Cannady and Parker arrived to meet Barrett in the Target parking lot at the Mondawmin Mall and were observed from Barrett's vehicle in a gray minivan.  Cannady and Parker were arrested and then searched incident to arrest.  Further, the vehicle was transported to the FBI Baltimore Field Office, where it was searched.

    <u>Sampson</u>:  On August 11, 2014 at 9:45 a.m., during a phone conversation between Sampson and Barrett, Sampson said to Barrett, "I need to see you bad yo."  Barrett responded, "I got you.  I got you.  On both.  I got you," meaning that Barrett had both cocaine and heroin for Sampson.  Sampson responded, "Oh, for real man.  I've been fucked up bro."  Sampson later stated, "I'm happy as shit you called man."  Barrett later discussed pricing with Sampson and stated that he was "gonna put it a low . . ., low tax."  Barrett explained, "Seven five for the . . ., for the ah, you know which one" (meaning the heroin), and "about thirty-eight since it's the drought on the other thing" (meaning the cocaine).  Sampson responded, "All right, that's cool.  Well thank you yo."  Barrett later stated that he was going to let Sampson go "one-on-one," meaning one kilogram of each (heroin and cocaine).  On a separate call at approximately 3:40 p.m., Sampson told Barrett, "I got some cash for you for when I see you."  Later in the call Samspon told Barrett, "I got thirteen hundred somethin'," to which Barrett responded, "That's better than nothin'."  In a later call at 4:07 p.m., Barrett asked Sampson, "Yeah, you got the bread yet?"  Sampson responded, "Yeah absolutely."  He then told Barrett, "I be down the way in like three minutes."  In a later call, Barrett told Sampson to meet Barrett at the Ross at Mondwamin Mall and Sampson said he would be there in about seven minutes.  At 4:12 p.m.,

Sampson told Barrett that Sampson was in a "silver Honda."  At approximately 4:25 p.m.,

Sampson arrived in a silver Honda Accord to meet Barrett and was observed from Barrett's

vehicle.  Sampson parked the vehicle and was arrested as he attempted to enter Barrett's vehicle.

Sampson was searched incident to arrest.  Officers then approached Sampson's vehicle and

observed the driver, Latoya Eaton, attempt to hide a stack of U.S. currency underneath her read

end on the driver seat.  At this time, Eaton was asked to exit the vehicle and the stack of U.S.

currency was observed lying on the driver's seat.  Upon discovery of the currency, Eaton's

daughter, Jamaya Thompson, who had also been in the vehicle, screamed, "That's not my mom's

money!"  Eaton yelled in response, "Jamaya, shut the fuck up!"  Officers also observed in plain

view a second roll of U.S. currency in Eaton's purse, which was wide open, and a third roll of

U.S. currency exposed inside the vehicle's console underneath the radio and climate controls and

in front of the vehicle's gear shifter.

    <u>Washington</u>:  In the case of Washington, the meet location was arranged by Washington

and Cooper, not Barrett, which was an apartment complex where Cooper worked part-time.  The

meeting occurred after several phone calls between Barrett and Cooper in which they agreed to

acquire narcotics from Barrett.  Barrett had previously supplied both Cooper and Washington,

together, on multiple occasions, supplying them with kilogram quantities of cocaine as far back

as November, 2013.  Barrett described "Cuzzo" (Washington) as the financier for "Vito"

(Cooper).  Barrett knew both Washington and Cooper, by sight, as well as by their nicknames

"Vito" (Cooper) and "Cuzzo" (Washington).  Barrett also knew the type and color of the vehicles

they drove, including the fact that the vehicles had DC license plates.

    During one of the calls leading up to their meeting, Cooper told Barrett that Cooper and

Washington could not meet until after 6 p.m. because Washington had to pick his son up from

school first.  Barrett explained to FBI S/A Eric Nye that Cooper often told Washington that the

price was higher so that he could, with the help of Barrett, steal money from Washington.  In a call at 6:14 p.m. on August 11, 2014, Cooper told Barrett, "Tell him again, I gotta make sure. . . . Yeah, so ah, I'll just double back tomorrow or Friday and get mine . . . You know what I mean?" In this call, Cooper was confirming with Barrett that he would return later to take Cooper's portion of the proceeds from the sale.  In another call, Barrett confirmed who would be at the deal and stated, "Just me, you, and Cuzzo (Washington), right?"  Cooper responded, "Yeah."  At 8:01 p.m., Cooper stated to Barrett with a slight laugh, "Don't . . . don't make me speed man. Please."  Barrett responded, "Oh no, I definitely ain't doin' that.  That's why I ain't tryin' to speed."

At approximately 8:44 p.m., S/A Nye positively identified a silver Chevy Impala and a silver Honda Accord driven by Cooper and Washington entering the parking lot at the meet location.  Both Cooper and Washington were arrested and searched incident to arrest.  Upon Washington being arrested, identification was obtained from in the form of a driver's license. FBI S/A Nye showed Barrett only the face depicted on the license, covering up the names and any other identifiers.  Upon being shown the face on the license, Barrett positively identified "Cuzzo" (Washington).   Washington's vehicle was transported to the FBI Baltimore Field Office, where it was searched.

Brown:  In a telephone conversation between on August 11, 2014 at 12:01 p.m., Barrett asked Brown, "What's up," to which Brown responded, "Shit, it's around.  I'm waitin' on you. I'm ready."  Barrett asked, "What's the . . . what's the . . . what's the number?"  Brown responded, "Ah, what . . ., what . . ., what . . . what is it?  I don't know.  I'm waitin' on you." Barrett stated, "That's what I'm sayin'.  Thirty seven" (meaning $37,000).  In a later call, Barrett and Brown pick the meet location (the Mondawmin Mall).  At approximately 1:30 p.m., Brown informed Barrett that he would be there in approximately five minutes.  At approximately 1:39

p.m., Brown was identified driving a white pickup truck.  Brown and the passenger were arrested

and searched incident to arrest.  The vehicle was transported to the FBI Baltimore Field Office,

where it was searched.

<u>Agnant</u>:  On August 11, 2014, in a series of phone calls, Agnant and Barrett try to arrange

a location where to meet; Agnant was trying to arrange a location closer to where he was located.

At 12:23 p.m., Barrett told Agnant, "Don't worry about all the paperwork . . ., just as long as you

got half the paperwork . . . , come on and I can see you tomorrow for the rest . . . early though."

According to Barrett, he was telling Agnant to bring half of the money to pay for the narcotics.

In a call at approximately 3:06 p.m., Barrett asked Agnant, "What's it going to be all together?"

(meaning the number of kilograms of cocaine).  Agnant responded, "It's going to be about

fifteen . . . but I'm about to come out there and holla at you real quick."  In a later call at 3:07

p.m., Barrett and Agnant arranged to meet at Mondawin Mall by the Target.  In a call two

minutes later, Barrett clarified and directed Agnant to park by the Ross and walk over to the

Target.  At approximately 3:59 p.m., Agnant was observed in a teal Acura MDX vehicle and

parked his vehicle in the lot.  Agnant then proceeded to walk to Barrett, where he was arrested in

front of the Barrett's vehicle.  Agnant was searched incident to arrest.  Agnant's vehicle was

transported to FBI's Baltimore Field Officer, where it was searched.

For each defendant, there was probable cause to arrest them for a narcotics offense based

on the phones calls prior to their arrival and Barrett's prior dealings with each defendant, which

were consistent with how the defendants proceeded on August 11, 2014.  As the calls make

clear, the defendants were meeting with Barrett to purchase a large quantity of narcotics

(cocaine, heroin, or both).  Each defendant had previously purchase large quantities of narcotics

from Barrett in a similar manner.  In each case, phones were used to communicate regarding the

narcotics purchases and defendants were going to purchase the narcotics in cash.  Thus, there

was probable cause to believe that both there would be evidence of a crime in the vehicle or on their persons.  *See United States v. Robinson*, 414 U.S. 218, 243-35 (1973) (holding that, upon lawful warrantless arrest, police may conduct a full search of an arrestee's person and personal items in his possession and control, without any additional justification).  A warrantless arrest is valid so long as "there is probable cause to believe that a criminal offense has been or is being committed."  *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).  The defendants' arrests either at their vehicles or soon after exiting their vehicles for a narcotics offense served as a basis for a search of the vehicle, in accordance with "automobile exception," which provides that if a car is "readily mobile" and probable cause exists to believe, (as was the case here based of the drug activities of the defendants, confirmed by the interception of calls between the defendants and Barrett and the prior transactions with the defendants), that the vehicle contains contraband or evidence of a crime, then a warrantless search is permissible.  *Maryland v. Dyson*, 527 U.S. 465, 466 (1999); *United States v. Johnson*, 599 F.3d 339, 347 (4th Cir. 2010); *United States v.Kelly*, 592 F.3d 586,590 (4th Cir. 2010); *United States v. White*, 549 F.3d 946, 949 (4th Cir. 2008).  *See also, Arizona v. Gant* 556 U.S. 332, 343 (2009) (warrantless search of vehicle permissible when driver arrested and reasonable to believe evidence relevant to the crime of arrest will be found in vehicle).  Further, in the case of Sampson's vehicle, the large amounts of U.S. currency were in plain view and thus could be seized as evidence of the narcotics offense.

### (L)      MOTIONS TO COMPEL DISCLOSURE OF INFORMANTS.

Defendants Cannady and Sampson have filed motions to compel disclosure of informants.  (Docket #s 120, 129).  To the extent other defendants have filed boiler plate motions to adopt the motions filed by the co-defendants, arguably they also seek to compel disclosure of informants.  Cannady and Sampson have filed motions to compel the Government to identify the identities of all informants, including statements made to the Government, benefits received by

the informants, and the nature of any assistance provided to the Government. Not only have all

defense counsel been made aware of Barrett's identity as a confidential source, but all defense

counsel have signed discovery agreements in which the parties agreed that *Jencks* statements and

*Giglio* material (such as witness' plea agreements, criminal convictions, and prior inconsistent

statements) would be turned over one week prior to trial.  The Government intends to abide by

the provisions of the discovery agreement.  Therefore, any motion to compel is moot or, at best,

premature.

### III.          <u>CONCLUSION</u>

For all of the above reasons, and other than those motions for which the Government has

no objection, the Government respectfully requests that the Defendants' pre-trial motions be

denied.

<div style="margin-left: 50%">

Respectfully submitted,
ROD J. ROSENSTEIN
United States Attorney

</div>

By:          _____/s/_____

<div style="margin-left: 50%">

Seema Mittal
Christopher J. Romano
Assistant United States Attorneys
36 S. Charles St., 4th Fl.
Baltimore, Maryland 21201

</div>

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this ___18th___ day of February, 2015, a copy of the foregoing Government's Response to Defendants' Pre-Trial Motions was electronically filed with notice to all counsel of record:

_____/s/_____
Christopher J. Romano
Assistant United States Attorney